We'll announce their second case of today, Coleman v. Miquon, Inc., number 20-1115. And we have Mr. Bell and Ms. Ocalino and Mr. Brown. I should note at the outset that while we have Mr. Bell for you, 10 minutes set aside, we may not use all of that and Ms. Ocalino, we're probably going to go significantly beyond five minutes with you. Mr. Bell. Good morning, Your Honors, and may it please the Court, James Bell on behalf of the appellant, Mr. Justin Coleman. I had intended, Your Honor, to ask for six minutes of time with four minutes of rebuttal, but I will take my guidance from the Court now that you've so stated. We don't tend to watch the clock too much anyway, so go ahead on your first two issues. Your Honor, having done this for many years, there's always that surprise moment with the appellate court where you find out why they thought your case was interesting enough for an oral argument. And is there any guidance that the panel has for what they might be interested in? I can tell you that our primary concern is the hostile work environment. It doesn't mean that you don't get a chance to make your case on the retaliation and discrimination claims, but our principal concern, speaking only for myself and I think my two colleagues agree, it's hostile work environment, and so we do want to hear from the EEOC. Yes, Your Honor, with respect to the hostile work environment and harassment claim, it seemed to us primarily that the learned trial judge's mistake below was but to ignore the existence of many, not just a few, material facts that were actually in dispute. For example, the court below seemed not to focus on the near constant use of the N-word, and by N-word in this instance, since it seems to be a separate issue in this case, I mean the N-word that ends in E-R as opposed to the N-word that ends in A, seemed to lack appreciation of how many times that word was used in both the A and the E-R contexts. Can I ask you about that? Your client made some vague references to it being used constantly, but was asked at say, was it once a day, once a week, whatever. We're at summary judgment now. Is there anything in the record that makes more specific how frequently we're talking about? I could not find it. I found him just saying it was used all the time or constantly. Is there anything more specific than that? Well, Your Honor, there are specific references to it in his complaints to the individuals, which he remembered, unfortunately, at the time of his interrogatories and swearing his interrogatories, but did not remember at the time of his deposition. Can you point me to, there's nowhere in the deposition you're saying, can you point me to anything else that's in the joint appendix that's, you know, not with respect to frequency? Not with respect to frequency. With respect to frequency, his statement was that it happened all the time in many contexts, especially with Mr. Bednar. Especially with Mr. who, what's his first name? His first name, Your Honor, is Eric Bednar. B-E-D-N-A-R. He said that he used it when he was upset. He used it in a number of contexts. He used it. He's a co-worker, not a supervisor. That's correct, Your Honor. All of the folks accused of using the racial epithets were co-workers and not supervisors. The supervisor's use of appropriate language, to whatever extent you would call it that, was merely to use the categorical language like you people or those. What I was also looking, I mean, the district court put a lot of weight on not just frequency in general, but whether this was directed at him. I'm looking at the appendix 7 and appendix 22, and it cites a passage from his deposition, you know, appendix 205-06, that it appears that these comments were made in his presence. He was in the area. Is there anything in the deposition that says that he was the target, that it was directed at him? No, Your Honor. Okay, so then my question is, I think you have a problem under Kaber v. City of Trenton. Kaber v. City of Trenton said it can be severe or pervasive generally, but for it to affect the terms or conditions of his employment because of his race, you got a causation issue that but for his race, would he have been hearing it? And a lot of the stuff you're describing, like, you know, some very offensive stuff that said to customers about customers, sounds like from his own deposition, it would have been said to the customers whether your client had been white or black. He wasn't discriminated against on account of being black. So what's your response? You don't have anything in the summary judgment record that's because of his race that was directed at him? No, Your Honor. The issue there, and of course, the learned judge below stated it as it wasn't weaponized. I think that Mr. Coleman's own testimony as to those issues, which is, I never think that that use of language is a joke. I never think that that use of language is appropriate, is probably along the lines of what I'm thinking. With respect to the case, the Cable case, my colleague from the EEOC has pointed out two cases from the 7th and 11th circuits. I believe there were Reeves and one other that look at that issue and have come out entirely differently than the 3rd circuit. But we're bound. Yeah, we're bound by that. I don't know how to get around that. I mean, that's the precedent of the 3rd circuit, right? Yes, Your Honor. And so, I mean, even if we were to agree with you that the 7th and the 11th had a different approach, and we were to espouse that approach, we're bound by Kaber absent going in bank. Well, Your Honor, the world has changed quite a bit since Kaber. The race relations of the world are not what they were 20 years ago, and going in bank is the right thing to do. But as of today's date, November 18th, 2020, our precedent hasn't changed. Yes, Your Honor. I understand that, and I wish I was arguing under a different case law. On the termination issues, the problem that you have is that you have a seasonal restaurant. You've got people that are laid off in late August, September, 55 of them here, most of them white, and this person's mother is still one of the people that's retained. It just doesn't look like a good set of facts for any type of claim of discrimination, racial discrimination, in terms of firing or retaliation, because the firing appears to be last in or last hired, first fired. Your Honor, I would certainly agree that the case of discrimination is weaker than the case of retaliation, but I believe that there are enough problems with the idea that this was just an ordinary end of season termination, that whether or not Mr. Coleman prevails, it was certainly the kinds of issues that a jury ought to decide. That being, first, Mr. Coleman's time of hire, that he was to be a year-round employee. Second, there were other employees who were hired only a month or two or three before him who continued working longer into the year. But there were also problems with this particular individual's performance, and we even have that, there's a tape of that, right? Yes, Your Honor, there was a problem with performance, but the defendants, or I'm sorry, the appellees, are not claiming that that was the reason for the termination. They have focused almost entirely on the idea that this was because it was an end of season termination, because he had what they thought to be difficult hours to schedule around, and because he was one of the last hired. With respect to that, I think the fact that my client is testifying, he wasn't told any of that at the time of his termination. At the time of his termination, he was told that he was being fired for a lack of performance. The fact that they've come into court and said an entirely different thing, Your Honor, I believe puts us in the what else situation or some of those other situations where you've got changing reasons. Additionally, in this instance, because there's a tape, and because we know what was said on the tape, and because it doesn't say what the defendants say was said at that final meeting, a jury could certainly conclude that the appellees have told a falsehood regarding what happened at the termination meeting. And if they conclude that the termination meeting differed in kind from what my client has described, they might scratch their heads and wonder why that story changed, just as they might wonder why the story changed for purposes of litigation. Mr. Belk, I have a couple, two more record questions before we let you go. One of them is early in the case, there were some allegations about Serafina Moore actually whispering the N-word in your client's ear, but in his deposition at page 44, appendix 206, he said that didn't happen. So that's out of the case, right? That's correct, Your Honor. Okay, the other... I mean, there is cross testimony about that. My client did not take that position. The appellees have taken it. But we can hold that against you. As part of the summary judgment record, that's not a ground to defeat summary judgment if your client has said it hasn't happened. That is his recollection. The other record question I've got is the black music incidents. This is an Irish bar. You would expect that an Irish bar might just be playing Irish music. Is there anything in the record about whether it just ordinarily played Irish music if the black music was just in contradistinction that we just don't play other kinds of music? Your Honor, the only thing I have on that, I'm sorry, I never thought to ask that question during the course of the case. The only thing that I know about that is that the jukebox had a variety of different kinds of music on it. And I believe that much of the music was supplied by the choices of the clientele. Okay, is there anything in the record? The only thing I recollect, Your Honor, and I don't remember exactly where it is, I didn't recognize its importance, is that one of the complaints that my client made was that in turning down or off the black music, they were sometimes, or what was referred to as black music, they were sometimes forced to stop a client's music from continuing. Music that the client had asked for. But your client was not requesting this music that was objected to, he was not the target of those remarks? No, Your Honor. Okay, thanks. All right, thank you. We'll hear from Ms. Ocolino and we'll get you back on rebuttal. I know you asked for six minutes, we gave you 13, but we'll still give you four minutes on rebuttal. Thank you, Your Honor. Good morning, Your Honors. Thank you for hearing from the EEOC today. I think that we have a lot to unpack. I'll just start backwards with some of these questions that Your Honor had about the music. I think that a jury could really find that this was not just a restaurant that wanted to play Irish music. I think that the testimony and evidence here is that Mr. Nielsen, the general manager, had a real aversion to anything that he called black music, and Ashley Coleman and Mr. Coleman said that was rap, hip-hop, R&B. So it wasn't just that they wanted only Irish music, I think that there is evidence in the inferences that he did not want what he called black music. What would you cite in the record that would allow a jury to draw that inference? Well, I have in front of me some of the evidence sites about the music. So Mr. Coleman testified, this is A216 of the appendix, that Mr. Nielsen didn't like rap or any artist of color. He would go back and turn it down. So if a customer in the restaurant was playing it, or my understanding is anybody, an employee too, but he would turn it down. In the Coleman interrogatory, excuse me, at A404, Mr. Nielsen said the next person that plays this, excuse me, shit is going to get fired. So that was the comment that was made to staff and included Coleman. So just as an aside, this is a comment that I think a jury could find was directed at Coleman. It was made to him. Ashley Coleman, A157, Mr. Nielsen said no black music. He did not like rap or hip-hop. So I think that that is relevant. I think it would be fine if an Irish restaurant said, we just play Irish jigs, but that doesn't seem like what the record showed here. Now I'd like to backtrack to the Caber case, which I think is certainly not as strong as the EEOC would hope, but I'd like to emphasize that even in Caber, this court recognized that comments that are not directed at the plaintiff can be relevant to the hostile work environment. So we think that even though the N word was not said like, Mr. Coleman, you are an N word, that this does factor into the hostile work environment. And I don't have the whole case printed out in front of me, but I have an excerpt I had written down and this court had said racist comments involved in this case cannot alone be the basis of a hostile work environment. So I'd like to think that there is still some room for this court to acknowledge the comments that are not directed at the plaintiff in terms of him being called a slur can still factor into it. Where are you in Caber? You know, I'm sorry, your honor. I didn't write down the very page, but I read Caber as saying that comments that are not directed at the person can still be relevant. There is language that suggests that by itself it's not enough, but this is not a case. Okay. But I don't read the district court as having said that it's never relevant or not relevant. The district court just seems to have taken the language of Caber that says, you need something directed at the plaintiff. And then you might interpret other facially neutral things as really being motivated by discrimination that said to him, they don't have race on their face, but they're really racist underneath. You can draw an inference from the racist comment that was made to him. And so what, what's the racist comment that was made to him? I mean, the 7th and 11th circuits would leave that door open, but what in Caber allow, what in this record allows us to get past Caber? I just want to point out one thing about the N word. And then I'd like to talk about other comments that were made to him, but Mr. Coleman testified in his deposition at page eight to 10 of the appendix specifically about Eric Bednar, who seems to have been the primary one to use the word. Mr. Coleman testified. If we are having a conversation, he would say it in us talking, or if I'm like right next to him, you're in a restaurant. So when you're picking up drinks and I highlight that because that means that Bednar used the N word in a conversation face-to-face, which is to distinguish it from other cases where the plaintiff has just overheard maybe two coworkers or a customer and a coworker using the N word. So that may be another basis to distinguish this from Caber, but there were comments are made to Mr. Coleman. He testified on his very first day of employment. He shows up to work and Tracy Venturini, a Caucasian coworker says to him, what are you doing here? This is an Irish pub. The last time we had a black bar didn't work out. So that's one comment to him. I think we've covered the black music comments. And so, so, so let's talk about that. Is that, is that bartender then making any of these other comments to him? The one who said this on the first day, such that it's a continuing pattern where she should be interpreted that way. Well, Tracy Venturini is one of the white coworkers that the plaintiff identified as having used the N word and I'm quoting quite frequently that's at page eight, two zero eight of the appendix is deposition page 47. And then also there's another category of comments less severe, obviously than the N word, but Mr. Coleman testified in his deposition at page two one five of the appendix. And also in his interrogatory response, a four Oh seven that several of his coworkers, including Ms. Venturini, Mr. Bednar, the Dean Botarenko and another person named Tyler. And also Mr. Nielsen used they, or you people, which this court has recognized as inherently racist terms. I don't see, I'm looking at a two one five. I don't see any of that being used at him. And, and you know, you're, you're reading a true await that way, but the, you know, he's asked point blank if it was used at him and the district court understands it is no, you know, he, he, he's asked repeatedly and he never says, yes, it was, he's kind of dancing around it. So where in a two one five or two one seven, do we understand that you people or those people being used at him? Well, I say two one five, because he says that Tyler uses they, or you people as referring to Americans. Obviously, Mr. Coleman is African American. There's a distinction between it's being used in his hearing, which he says repeatedly in the deposition versus being used in some fashion that is directed at him as required by caver. And I think that's the problem here that you can't just jump from he is African American to he is directed at, or the target is required by caver. So what I want to know is you've pointed to two oh eight, we can talk about interpreting that what besides two oh eight, two oh eight suggests that it might have arguably been used directed at him. I think that that is our best record evidence, but your honor, you just said dancing around and it is summary judgment. So the plaintiff's attorney could argue to the jury and the jury could figure out, you know, does this count as being directed at you? But there is at least one comment about, about the first day that he was working there and the black music that I think the jury could find was directed at him. What about black music? I didn't see anything in his record suggesting black music was directed at him. Well, when he was part of the staff to whom Mr. Nielsen said, there's no black music here. And the next person to play black music is going to get fired. That was a direction to staff, including him. So that was to him. He was asked about whether that was to him and he didn't say it was. Well, he said it was made to staff. That's an interrogatory response. 404, 407 to 408. And also his deposition, he says he, he's referring to Mr. Nielsen said, if anybody else plays black music, then they'll get fired. Let me, let me pose. It's not a hypothetical. When I started out practicing law in Delaware in 1965, there were a number of occasions in those first few years where male attorneys in my presence would talk derogatorily about women and about the inability of women to think clearly and the inability of women to be logical. The comments weren't directed at me as you can't think clearly, you are not logical. But at the same time, I felt those comments were directed absolutely at me because without saying so they were saying, ha ha, you're part of this class and you're, you're just as bad as these other women are. Is that direct, is that concept of correct interpretation of directed at? Well, that is the argument that we put forward in our brief when we cited the Reeves case from the 11th circuit that when somebody uses the term, the B word to refer to women, the speaker doesn't say, and also I include you because you are a woman and therefore you are a B word. So that is our view of the law. We understand that Kaber presents some impediments to our argument here, but when a speaker uses a term that's degrading and humiliating, and this court and others have recognized just how degrading, humiliating the N word is, it's no stretch for the person who hears it used targeted someplace else or overhear it to think he's talking about me because I'm part of that protected category of people. Okay. When the person is talking to you about, in my case, other women being illogical or frivolous, I felt that the comments were directed to me. Is that? I think that is how we would view it. I understand the speaker has some other language, but that is how we would view it. I think that Kaber uses the word sting. There's more sting when the comment is directed to you, Mr. Coleman, you are an N word, but I think the honestly still there when he hears the word used and thinks that includes me. It's directed at me in the sense that I am part of that group. Ms. Ocalino, forgive me the pronunciation. So Judge Roth was asking about comments that were said to her about someone else. Which of these comments counts as something said to Mr. Coleman? The first day bartender comment qualifies. What else was said to him? I think about the music you said, oh, it was to staff generally. We could talk about whether that was to him or just in his hearing. The comments to the customers, those were in response to customers. They were not made to him. So what else was made to him? You said that the argument that we put forward in our brief is the comments from Mr. Bednar that were made in conversations directly to and with Mr. Coleman counted as directed at Mr. Coleman. All right. So that's what you say about A210. So we should look at the first day bartender comment. I can't remember the record site for that. And we should look at A210. And those are the ones you have that are said to him or arguably. The first bartender comment would be at A202. And also Tracy Venturini, we haven't covered this, but she was also the one who would say as to other customers, when she got pissed off or angry at them, don't get black on me. Except those were said to the customers, not to Mr. Coleman. She was talking about the customers. Mr. Coleman obviously heard it and it was in his presence. Where does it say that that was said, not just in his hearing, but in the way Judge Roth was talking about being said to him about the customers? I don't think that we've suggested the record said that she was saying to Mr. Coleman, hey, you don't go black on me. Or saying to Mr. Coleman, they shouldn't go black on me. I didn't see anything in the record that suggested that in the sense Judge Roth was talking about. All right. You have a couple of citations. That's helpful. We can dig into that later. If you had it, I wanted to know. What he said was, I was in the area. That's a direct quote, A205. I was in the area. I was in the area from his deposition. Let me follow up. If you're going to have a hostile work environment claim, one of the things you need, the last factor, is the existence of respondeat superior liability. And what evidence is there that the restaurant itself, or the entity that owns the restaurant, is liable under respondeat superior for comments made primarily by coworkers and some sort of side comments about not playing black music, et cetera, in that particular restaurant, et cetera. There was a complaint made and supposedly the head of the restaurant said, we're going to have a sit down and make sure people understand that there's to be no discrimination here. So in that context, how is the employer liable under respondeat superior? I'm happy to answer that. I actually think the liability piece is a much easier lift for the coworker. Harassment is a negligent standard. Did the employer know or should it have known? And then did it fail to take appropriate corrective action? I think here the district court made some classic errors on summary judgment in weighing the evidence. You referenced the employee meeting. So it is true that Mr. Slavik, the owner, he acknowledged I did get at least one anonymous racial complaint. And I told Mr. Nielsen to have a pre-shift meeting with the staff and no racist comments are permissible. The district court credited that meeting is happening, but Mr. Coleman and Ashley Coleman said it never happened. So even using the employer's version of events here, which they admit, we got at least one complaint of a racial slur. Mr. Slavik testified that he didn't look into the identity of the harasser and didn't need to do that, but he called the meeting, but it's disputed whether the meeting happened. In addition, the district court here, aired in my view, inexplicably disregarding Mr. Coleman's testimony that he complained to three different managers making verbal complaints. He testified specifically to whom he complained first, Bob Jacobs. Then he complained to Ed Nielsen. Then he complained to female manager, Bobby Hornbeck. He said he complained about the racial slurs and that their responses were all similar. Bob Jacobs said that he would have a meeting, but didn't. He just kind of brushed it off. Mr. Nielsen had not really any response, I'm quoting, not really from Mr. Coleman's deposition. And then Bobby Hornbeck told him to just ignore it. She knows that they're immature people working there. So that's three other times, in addition to the acknowledgement that they had received one racial complaint. And then if we turn to what did this employer do to prevent- Let me ask, let me follow up on that, if I may. What kind of reasonable avenue for complaints would be appropriate for a seasonal employee? I think that the handbook, I think it's not too much to expect that employer's handbook would tell employees that harassment is prohibited, to give some idea what harassment is, what we're talking about, and then avenues of complaint. So you have the employee handbook here in the appendix. You know that it has only one sentence about discrimination, says nothing about harassment and doesn't tell people to whom to complain. And that was a problem. You can see in this case that when Mr. Coleman made his written complaints, according to the employer, he sent it to the wrong address for Mr. Slawek. And he sent it to the email account for Heidi DeLarso, who also worked at the Ugly Mug. And the employer says, well, that was the wrong place to send it. And he says, how was I supposed to know to whom to complain and how to register my complaint when you haven't told me? Another piece of evidence that could bear on this is the employer says, oh, we have employees signed an acknowledgement. They've gotten the employee handbook. Again, just one sentence here about discrimination. But okay, where is the evidence in this record that Mr. Coleman hadn't signed and acknowledged that he'd even received the handbook? So I understand that this is not a huge employer. I'm not talking about FedEx. But I don't think it's too much to expect at this point that employers spell out what is prohibited conduct and to whom to complain. And there was, I think it's undisputed, or at least disputed, I have evidence in the record, there was no training of employees or managers about racial discrimination or to whom to complain. And then the last piece of the liability argument is this court recognized that, I think, Houston versus Procter and Gamble, that there can be constructive notice. If the harassment was so open air, was so pervasive, that the managers knew or should have known about it, and didn't do anything, then there's liability. And here, Ms. Hornbeck, one of the managers in the appendix at page 260, she testified that the managers worked out, on the floor with the bartenders and the servers. Now, if the jury were to credit Mr. Coleman's testimony that the NRO is used frequently, multiple times, and all the time, then a jury could say, hey, these managers must have heard it, and they didn't do anything. Ms. Eccolino, could I ask you about this? So we're not at an emotion to dismiss, as Castleberry was, we're on summary judgment. True. I'm troubled that, though he was asked repeatedly, how often, in what context, etc., he couldn't say every day, a couple times a week. I mean, other precedents that are being cited in this case involve some specific, not motion to dismiss precedents, summary judgment precedents involve some specificity about how often. I can't find anything in this record, setting aside that first day comment that really pins down a time frame, a frequency, anything else. What do we do with that on summary judgment? Isn't that a problem? No, it's not a problem, Your Honor, respectfully. We cited the Beta v. Transamerica case from the Sixth Circuit that says that the lack of specificity is something for a jury to consider when it's weighing the evidence, but that's for a jury to do. We also cited the Day case from the Seventh Circuit, which said that where the plaintiff testified to almost daily comments, gestures, and sexual innuendos, the jury could consider that when the plaintiff was able to describe five specific instances. So those two, the weighted evidence... All right, daily says almost daily, so that's much more specific than we have here. Beta, I'd have to look at it. I haven't looked at it. Do you have anything from the Third Circuit? Could I just say daily? I honestly don't see daily as much different than used it often, all the time, quite frequently. I mean, daily gives us a temporal limitation, and some people might think all the time as, you know, every two weeks. Some people might think it's every day. I'm wondering, do you have anything from the Third Circuit on specificity required at the summary judgment stage? I do not, but I'll also throw in there, I think a jury could consider Mr. Coleman worked only for 11 weeks, and when I read the transcript of the hearing in the district court, I think it was 68 days was the number the plaintiff's attorney gave. So the jury could consider what does that mean frequently and all the time if he worked only 11 weeks or 68 days. Okay. Why don't we hear from Mr. Brown, and then when we get to rebuttal of the four minutes, we'll give Mr. Bell two minutes and you two minutes as well, Mr. Aquilino. Thank you. May it please the court, Adam Brown, on behalf of the appellee, Mequon Incorporated. I'm going to focus where the court focus, which is on first, which is on the hostile work environment claim. And I want to say first that your honors are correct that the CAVR precedent is fatal to this claim. Mr. Coleman testified almost exclusively about comments he overheard, comments that were in the ether, in his environment, not directed at him. Mr. Brown, you're very fair and you were also careful to say almost exclusively. Maybe the first day he's at work saying, what are you doing working here? They don't hire black bartenders when in fact they did have some other black bartenders. But so that's specific. It's said directly to him. It could very easily be taken personally on account of his race. Why isn't that enough to distinguish CAVR? The reason that is not enough is, well, it may or may not. Let's assume as we must, the truth of that allegation. The law of hostile work environment has a demanding legal standard that you must meet. It cannot be based on isolated, sporadic comments. In fact, words alone usually are not enough. There has to be something more than just an occasional comment that's offensive. There are many decisions that state that. Wait a minute. You say words alone are not enough? I mean, if it was pervasive that you were using pejorative terms with respect to African Americans, wouldn't that be enough? It can be, Your Honor, but not if it's isolated and sporadic is the answer to that. I'm saying, but if it's just pervasive, pejorative terms pertaining to, without doubt, African Americans, that would seem to be, in and of itself, enough to show a hostile work environment if it's pervasive enough, which is why we're exploring how pervasive do you need to be. But I'm putting the rabbit in the hat for purposes of this question. Thank you, Your Honor. I was responding specifically to the question about Tracy Venturini's alleged comment about Black bartenders. But to Your Honor's point, is it pervasive? Is it evidence of a pervasive hostile work environment to say that something happened? Could it be? Could it be? Could it be? Yes, if it were tied to some specifics, as Judge Bevis was pointing out. If there's some specific temporal framework there, if there's some kind of... So we have Tracy's comment the first day he shows up for work. Now, let's try to tie it to some other stuff. How about this A210? Eric Bednar is saying the N-word a lot, too frequently, et cetera. And Ms. Soccolino makes a forceful argument saying, well, the district court interpreted this as it wasn't really to him, but he's asked directly, was he saying it directly to you personally? Question, answer. If we're having a conversation, he would say it in us talking. Or if I'm right next to him, you're in a restaurant, so when you're picking up drinks or anything else and you say it, you still said it. It doesn't matter. So the first part of that response, she interprets as being in a conversation with him. And then the second part is, man, maybe I overheard it with some other people. Why isn't his reference to, well, maybe this means Bednar said it in conversation with me. Why isn't that enough to connect up to the first day comment? Because number one, Your Honor, it's not specific enough. It doesn't say when it was said, anything about the context, what kind of conversation it was, what they were talking about, where it happened, when. None of the who is there, but the what, when, and where are not there. Secondly, if it did happen, again, it's one piece of the puzzle of an isolated and sporadic pattern, which under the- I apologize for the interruption. We've lost Judge Ambrose on the line. Okay. I think that might be Judge Ambrose. Yes. We're bringing him back right now. All right, Judge, you can hear me? Yes, I am back. Zoom discriminated against me here. Well, but perhaps with cause. I think there is. In my case, there certainly is cause. There's no doubt about it. All right. We're back with Mr. Brown. I'm sorry. Where we left off, Judge Bibas was asking you a question, and he froze on me, and then I was kicked out. I think you had said something about we have context only the who, but not the what, where, or when. We have just one piece of the puzzle here. Where did you want to go from there? The standard, Your Honor, is much higher than that. One comment with one small aspect of it that's testified to specifically is simply not enough, and that's not enough. But what do you want to do about Ms. Ocolino's argument that, you know, at A210, Eric Bednar is saying, when he's asked about whether it's directly to you, Mr. Coleman says, if we're having a conversation, he would say it in us talking, but then there's a more general reference. When you're picking up drinks, you might overhear someone. You still said it. It doesn't matter. So you've got that. I don't know how you think the district court should have thought about that. What do you say to those two arguments she made with some force? As to the first argument, I would say that the allegation about Mr. Bednar, who I understand only worked at the restaurant a few days during the summer and was not there the entire time, but in any event, that is an isolated comment. To the extent we even know when it happened. No, he says it was too frequently. He said it a lot. So I don't know. Yeah, I don't know how long he was there during those 68 days, but it sounds like he was the most person who violated the language protocols the most often. A lot, Your Honor. The testimony is that he said it a lot too frequently. I personally don't know what that means. I don't know how a jury could interpret that to mean that it was a steady mirage of appropriateness. And that begs the question, how many times would Coleman need to hear these pejorative terms, including the ultimately pejorative term, before it becomes severe or pervasive? Remember, it's an or now after Castleberry. Yes. And Your Honor, the cases don't set a specific quantity of instances. But Castleberry, for example, it was one instance, as the court knows, but the facts in Castleberry were much different. And obviously that was a motion to dismiss decision. But in Castleberry, the N word was used once. That was found to be sufficiently severe to state a claim. But it was used by a supervisor directly to the employee in the context of threatening to terminate the employee. Much, much different from what we have here. And there was specific evidence on that. There was, I don't know what the evidence was, but there was a specific allegation of that. That's not what we have here. What we have here is amorphous, vague, nebulous allegations that he said it frequently. He said it a lot. I take the point that he was only there 11 weeks. And so you could infer on some level that it was a compressed timeframe. But the testimony, to hang your hat on that testimony a lot or too frequently. To me, that does not meet the legal standard. It is not a jury question. So let's take severe off the table. If it doesn't rise to Castleberry's level, why isn't it a jury question about whether this is pervasive? Why do you reject Mr. Bruno's argument that, you know, a jury ought to decide what all the time a lot or frequently means? You know, there's enough to get past summary judgment. And then especially in the context of an 11 week employment. Because your honor, those allegations don't have, again, those, they're not specific. They are not substantiated. They're not, they're not, there's no detail, no elaboration. It's, it's as vague as it gets. And that is exactly the type of evidence that accepts for purposes of sending a case to trial. Because how is it, how are we supposed to dispute his allegation that something happened a lot? I don't know that that's a dispute. That's, he says it. How do we disprove it without knowing when and where it happened in what context? He says we were having a conversation and you would say it's not talking. That does not create a question that can be decided at trial. Because how do we disprove that? Maybe we can get at this issue a different way. Kaver says if you have some racist comments, it's not that you can add on other racist comments that would have been said whether or not you're black. You could take some facially neutral comments that were negative and then understand that they were really motivated by racism underneath. Because it's really because you're a minority or some other protected group. Um, what do we have here in the way of, of things that Mr. Coleman had to suffer? And why shouldn't we understand them collectively as, as, as, as really coming at him because he's, he's black? I mean, he, he's prosecuting this lawsuit. He says he suffered. Um, you know, we have to credit all of that at summary judgment. Why isn't a jury question to decide whether collectively all the or not was really on account of his being black. Sure. And of course the court has to consider the totality of the circumstances that is, that is the law. But if you take the evidence and distill it down here to what it really is, it's not, it is, it's, it's very, very limited. Uh, it consists of, again, your honor pointed out, I think there are only two instances that the EOC was able to identify that are specific and that, that had any, any, uh, weren't directed in any way to Mr. Coleman. The rest of it consists of these, these vague sort of, um, allegations about it being in, around him all the time. Um, that, that to me, it does not, um, doesn't, it hasn't, it's not substantiated and it doesn't give us, um, any sense of what really happened. Your honor's asking what he was subjected to. We don't even really know. We know he, he claims the N word was said all the time. And by the way, I think we all agree the N word is, is a terrible word and should, should never be said in any workplace, but you cannot, if a plaintiff is permitted to say something in the deposition, such as it happened to me all the time, leave it at that, no detail whatsoever. That, that takes some re-judgment off the table for an employer, basically in every, in any case where, where an employee says that. And that can't be, that can't be, there's got to be some limit on which cases go to trial and which do not. And so yes, the totality of the circumstances is important. The totality here of the circumstances is very, very narrow. It's a couple of instances. Um, the law is that it cannot be just isolated or sporadic. It has to be a steady barrage. It has to be, it has to be, if it's just words and not any kind of physical intimidation or other, um, uh, hostile type types of, uh, conduct, then it's gotta be, it's gotta be very, very significant. And then this does not, does not meet that standard. What were the that is true. Um, there, there was a management structure in place. Um, the restaurant had shift managers and, and, and general man, a general manager, um, or two. And Mr. Slotwick was, was in the restaurant every day and was there and present to receive complaints. And by the way, the anonymous complaint, which, which I believe, I'm not sure Mr. Coleman admitted this, but we, we assume, I suppose that it was complained, did reach Mr. Slotwick. And so it was obviously possible to make a complaint and have it get to Mr. Slotwick and have it dealt with. But Slotwick claimed that he ordered the managers to talk to the employees about not using racist language. And yet both Coleman and his cousin who also worked at the restaurant said that such a meeting never took place. They denied that the meeting took place. My understanding is that, is that it did, but they may not have been present for it. It may have been on a shift when they weren't working. Mr. Coleman only worked usually two, three days a week. Um, that that's, that's really the best explanation I can give. The meeting did happen and Mr. Coleman says it didn't happen, but he can't really testify to everything that happened at the restaurant over the course of an entire week. He says he didn't attend it. And I take him, you know, we have to take that as true. That does not mean that the meeting didn't happen. The, you know, if you had a restaurant that had maybe 10 or a dozen employees, I can see why there is no, aren't any real formal procedures, but this restaurant during high season, during the summer has over a hundred employees. And even during the winter, it sounds like it still has about 45. So this seems that you go significantly beyond the argument that we're too small, uh, to, to, uh, deal with formal procedures. Uh, 100 employees is, would seem to be well past the threshold for where you need things covered in your handbook, uh, paths to make complaints. Uh, and then when a complaint is made, for example, the, uh, the one complaint that was made by email to was Mrs. Delario or whatever, Ms. Delario, whatever name was, is, uh, on Saturday, she said, well, it was sent to my personal email and I never look at it, uh, or for two or three weeks. Well, she can't say she never saw it because at some point it shows up in her personal email and she looks at her personal email. So there's a lot here that seems that needs to be sorted out before, before a jury. Your honor, I, I, this is now we're talking about the retaliation claim. I take it. Um, and the, the, the, the record shows that that email that Ms. Delarcio did not, she testified, she did not read the email, but furthermore, she also testified that she didn't discuss Justin Coleman with Mr. Slawek at any time. She had no role in personnel decisions, um, and so there, there is undisputed evidence that that email could not have played any role in the decision to let him go for the summer, which there is also evidence that, that letting him go was discussed a couple of weeks prior, or at least a week before between Mr. uh, I believe Mr. Slawek and Bobby Hornbeck and the wheels were already in motion on that long before he sent that, that email and the letter. The fact is it's undisputed that management didn't know about those two written complaints. They couldn't possibly, um, form the basis of retaliation claim because there is no knowledge of, of any complaint. But isn't that a question of fact? I don't believe it is your honor respectfully, because as to the letter, I mean, I, I, I'll talk about both the letter and the email. The letter was sent on a Saturday, um, sent certified mail. There's no return receipt. Mr. Coleman was unable to show when it was received. Typically it takes three to five business days. We're talking about one business day here, um, that, that, uh, elapsed between the sending of the letter and the date that he was let go. As to the email, there is no evidence that Ms. DeLarso ever saw the email. It was sent to her personal email account, which she said she doesn't check. There's nothing to contradict that. She, she, she wasn't even involved in the decision to let Mr. Coleman go. And so there can't be any causation there. There's no knowledge of the complaint. There's no connection between the complaint and the decision. And so I don't believe there are any fact questions to sort out there. I think the record is, uh, the undisputed record evidence is very clear on that. All right. Any further questions of my colleagues? Nothing further. Okay. We will, uh, hear on rebuttal. Mr. Bell, we're going to give you two minutes and then Ms. Occolino, uh, two minutes as well. Yes, your honor. Thank you. Um, first I'm not sure what it is about the difference between physicality and words that make us, um, so sure that they're different. If the frequency with which a woman was complaining about sexual harassment, where for example, someone touched her buttocks was all the time or too frequently, I don't think we'd be having this discussion about the same way that we're having this discussion about the N word. And I'm not sure why that is. Um, one thing, uh, that your honors were asking was about that. Can I ask just one quick question? Yes, your honor. I primarily focus on federal law, Title VII, but do any of these issues turn on whether we apply New Jersey or Title VII? Uh, Title, New Jersey, uh, always claims in writing to be broader and, and more, uh, forgiving and generous than the Title VII law, but I'm, I'm not sure. I can't think of any particular example of a way in which Title VII is more forgiving in, or is less forgiving than NGLAD in this particular instance, your honor. All right. Um, with respect to the, to the, the black on you comment, I think that's what the comment was. Don't make me go black on you. Not, um, not don't go black on me or the customer was going to go on me, but rather I was so upset by the customer. Don't make me go black on you. Okay. Where in the record is that said? I, I, I don't, I don't remember where it is. I, I, but I do know that it was black on you as opposed to the comment that, that was being discussed with counsel, which is don't go black on me. Okay. I thought I remember that being said towards customers, but anyway, all right, go on. Um, Oh, with respect to the idea of the context, again, I, I would, and I, and I know that it all always comes back to timing and proximity, but with respect to the what, where, and when of the use of the N word, I'm not sure what that context has to do with anything. The, the, the, the how often, which we've talked about extensively today certainly does matter. And if it's all the time that matters too, but the, what, where, and when, what, what, what are the, what, where, and when contextually of the use of the N word, what, what are we looking for? What, what facts would change our minds about whether or not it was offensive? There's no, there's no, there's no situation in which the way that it was said, or to whom it was said is going to make it not the most appropriate racial epithet in the language. One that's so vile that we have decided as a culture that we don't even say it anymore. There's nothing that does that. We'll hear from Ms. Thank you, Your Honor. And Judge Bevis, if I'm pronouncing your name correctly, you asked about the get black on you comments. And I, candidly, I think that the comment was towards customers. The comments are found on the record at 204 and 205, don't make me get black on you. And she would say that when she got pissed off at customers and Mr. Coleman was in the area. But having said that, I'd like to turn to the what, when, and where, which really struck me when Mr. Brown said that, because this is not a case lacking a what, where, and when. What? It was the N word, either flat out or yo with ending in an A or my ending in an A. And I echo what Mr. Bell said. How much context do we need for the N word for such an egregious slur? We know the when, we've covered that, we've covered the where, it was in the restaurant. And one piece of context that we haven't brought up, covered, and I would like to, is that Mr. Brown asked Mr. Coleman several times, do you think he was just joking? Do you think that this was just humorous remarks that were being made? And the answer A to 11 from Mr. Coleman was no, he wasn't just joking. So I really think that this is enough context. This is all we need for the N word. And I realized that CABR, you know, seemed, you seem to believe it presents some problems here. My recollection of CABR though, is it never talked specifically about the N word. It says that racial slurs were used towards prisoners and also that the plaintiff heard about, but never saw racist graffiti and flyers. So that would be another maybe way to get at this case and work around CABR. Castleberry recognizes just how severe a slur the N word is. So maybe you could go that route. If CABR involved the KKK, I would think the KKK is a pretty threatening racial reference. Well, so is the N word, Your Honor. No question, but I think they're both very severe. I agree that they're both very severe, but I think generally. No one has any problem in saying the Ku Klux Klan. Yes. Thank you. I think the N word really is in a category by itself, justifiably so. And you know, as a Hail Mary, then maybe this case needs to go on bonk for this court to recognize that when your coworkers are frequently using the N word, that is a hostile work environment. You know, I'm not sure CABR is good law anyway, because I wrote an opinion years ago in the 1990s versus Philadelphia Electric Company on hostile work environment. I think that's the case where a lot of the remarks were simply remarks made in the plaintiff's presence rather than remarks made to the present plaintiff. So maybe we don't need to get around CABR. Well, that would be terrific. I need to add a coda to that. Normally on our circuit, if a decision, the first decision says X, and then a later subsequent decision says Y, you, our precedent, our internal operating procedures say you have to follow the first until it is overturned in bonk, if the matter is on all fours. I would be happy to write a follow-up letter to this court if it's like that to talk about the I will. Why don't you send something on that? Would it be okay if we asked you to send something no more than five double-spaced pages by a week from today? Of course. And by four o'clock a week from today on the 20, well, today, I'm sorry, it's the Wednesday before Thanksgiving. Let's make it the Tuesday before Thanksgiving, 4 p.m. on the Tuesday before Thanksgiving, five double-spaced pages on whether CABR is the law of our circuit or whether the West case cited by Judge Roth in some way is different and precedes it. I'm looking at West right now, and a co-worker, Robert Cole, gave West a Christmas card with a KKK member with a whitewood robin hood. So there's at least something that was done specifically to Mr. West. What's the site on West? It looks like it's 45 F3rd 744, 1995. Thank you. All right, Ms. Lachlina, I'm sorry we interrupted you. Of course. I was also just going to touch very briefly about the liability to emphasize the page from Mr. Nielsen's deposition where he was the manager and he testified about the racial slur that there was no need to look into it. I didn't research the who, the what, the why, or the when. So again, I think the liability is a little bit easier here than the harassment piece, but I think it's pretty clear that a jury could find that the restaurant did not do enough, even though it knew or should have known about the harassment. All right, thank you very much. And I would ask if counsel would have a transcript or pair to this oral argument. And Mr. Brown, would you mind picking that up to cost for that? Yeah, I would not mind, Your Honor. All right. Thank you. Thank you very much. Thank you to all counsel for well-presented arguments. And we'll take the matter under advisement. And again, the supplemental filing should be by next Tuesday, 4 p.m., no more than five double-spaced pages relating to what is the, is CAVR good law or has it, was there something before it that would somehow contravene CAVR? Thank you to the panel. Thank you, Your Honor. Thank you, Mr. Brown. Thank you.